IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:25-CR-238 (MAD) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **KIMBERLY HUMPHREY a/k/a** | ) | |
| **Kimberly Owen,** | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **Kimberly Humphrey** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1)    <u>**The Defendant's Obligations:**</u>

a)    **Guilty Plea:** The defendant will waive indictment and plead guilty to Counts 1 and 2 of the information in Case No.  1:25-CR-238 (MAD), charging conspiracy to commit wire fraud in violation of 18 U.S.C.  §§ 1349 and 1343 (Count 1), and health care fraud, in violation of 18 U.S.C.  § 1347 (Count 2).

b)    **Special Assessment:**    The defendant will pay an assessment of $100 per count of conviction pursuant to 18 U.S.C.  § 3013.    The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $200, payable to the U.S.  District Court, at the time of sentencing.

c)    **Waiver of Venue:** The defendant agrees to prosecution of Count 2 in the United States District Court for the Northern District of New York and waives (gives up) any challenge to prosecution of Count 2 based on improper venue.

d) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

e) **Restitution:**

(1) As to Count 1 (conspiracy to commit wire fraud), the defendant will consent to entry of an order directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of the offense of conviction under 18 U.S.C. § 3663 or § 3663A.

(2) At to Count 2 (health care fraud), the defendant will consent to entry of an order directing the defendant's payment of restitution in the following amounts to the following victims, whether or not the losses suffered by those victims resulted from the offense of conviction:

| Victim | Restitution Amount |
|---|---|
| Medicaid | $113,586.97 |
| TRICARE, Defense Health Agency | $29,213.07 |
| Optima Health Inc. | $343,394.64 |
| **TOTAL:** | **$486,194.68** |

(3) The defendant agrees that the judgment will order restitution to be due and payable immediately subject to any payment terms set forth by the Court at sentencing and that the Clerk of the Court may release funds to victims without undue delay upon receipt of restitution payments from the defendant.

f) **Forfeiture:** Pursuant to 18 U.S.C. § 981(a)(1)(C) by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(7), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegations in the information described above, or to any substitute assets, or to money judgments, all as more fully set out below:

2

(1) As to Count 1 (conspiracy to commit wire fraud), a money judgment in the amount of $512,500.

(2) As to Count 2 (health care fraud), a money judgment in the amount of $486,194.68.

If any of the property described above, as a result of any act or omission of the defendant, either: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e).

g) **Access to Records:** The defendant authorizes the U.S. Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the U.S. Probation Office, including those provided as a part of the Presentence Investigation. If requested, the defendant will provide any privacy waivers, consents, or releases requested by the U.S. Attorney's Office to access records to verify the defendant's financial disclosures, and if requested will complete a further financial statement provided by the U.S. Attorney's Office as well as any supporting financial documentation to the Asset Recovery Unit of the U.S. Attorney's Office no later than 21 days after receiving such a request.

h) **No Transfer of Assets:** The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this plea agreement and/or that may be imposed by the Court. In addition, the defendant promises not to make any such transfers in the future.

3

2)    **The Government's Obligations:**

    a) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No.  1:25-CR-238 (MAD) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement.

    b) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3)    **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offenses to which the defendant agrees to plead guilty:

**Count 1 (conspiracy to commit wire fraud)**

    a) Maximum term of imprisonment: 20 years, pursuant to 18 U.S.C.  §§ 1349 and 1343.

    b) Maximum fine: $250,000, pursuant to 18 U.S.C.  § 3571(b)(3).

**Count 2 (health care fraud)**

    a) Maximum term of imprisonment: 10 years, pursuant to 18 U.S.C.  § 1347.

    b) Maximum fine: $250,000, pursuant to 18 U.S.C.  § 3571(b).

**All counts**

    a) Supervised release term: the sentencing court may require the defendant to serve a term of supervised release of up to 3 years, to begin after imprisonment.  *See* 18 U.S.C.  § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 2 years.

    b) Other adverse consequences: Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4

4)    **Elements of Offenses:** The defendant understands that the following are the elements of the offenses to which the defendant agrees to plead guilty.

### Count 1 (conspiracy to commit wire fraud)

a)  First, two or more persons conspired to knowingly and willfully participate in a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations, or promises, with knowledge of the scheme's fraudulent nature and specific intent to defraud, and reasonably foreseeing that one or more members of the conspiracy would use, or cause to be used, the interstate wires in furtherance of the scheme to defraud; and

b)  Second, the defendant joined that conspiracy, either at its inception or sometime during its existence, knowing the purpose of the conspiracy and intending to help it succeed.

### Count 2 (health care fraud)

a)  First, there was a scheme to defraud or to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises in connection with the delivery of or payment for health care benefits, items, or services;

b)  Second, the defendant knowingly and willfully executed that scheme with the intent to defraud; and

c)  Third, the target of the scheme was a health care benefit program, which includes any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual.

5)    **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offenses to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to those offenses:

**Count 1 (conspiracy to commit wire fraud)**

a) At all times relevant to the information:

    (1) Prime Capital Ventures, LLC ("Prime Capital") and Prime Commercial Lending, LLC ("Prime Commercial") were purported commercial lending businesses based in Albany, New York. Kris Roglieri, a resident of Warren County, New York, was the Chief Executive Officer and sole member of both entities.

    (2) The defendant, a resident of Virginia Beach, Virginia, was Executive Vice President of Prime Capital.

    (3) Christopher Snyder, a resident of Virginia Beach and the defendant's brother, worked for both companies, sometimes holding himself out as the "COO," or Chief Operating Officer, of Prime Commercial.

b) The defendant and Roglieri founded Prime Capital in or around December 2021. After founding the company, the defendant and Roglieri began claiming that Prime Capital had the present ability to make large commercial loans, including loans in the tens of millions of dollars, via partnership agreements with third-party hedge funds. As the defendant knew at all times relevant to the information, Prime Capital had no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources. Nevertheless, starting in mid-2022 and continuing until December 2023, the defendant falsely represented to Prime Capital's borrower clients and prospective borrower clients that Prime Capital had the ability to fund or obtain funding for large commercial loans in the tens of millions of dollars. During this period, Roglieri, on behalf of Prime Capital, signed contracts with borrowers that obligated Prime Capital to fund hundreds of millions of dollars in loans.

c) The defendant and Roglieri created a process for clients that wished to obtain loans from Prime Capital. First, Prime Capital issued, and asked a prospective borrower client to sign, a letter of intent ("LOI") that stated the size of the loan that Prime Capital intended to provide to the client, an interest rate, and fees and payments to be made to Prime Capital. Once both parties signed the LOI, the client was required to pay a due diligence fee to Prime Capital for due diligence that Prime Capital claimed to perform while it assessed the borrower's project and purportedly secured financing for that project.   Prime Capital typically charged a due diligence fee of $25,000 to $75,000 per project.

d) Following Prime Capital's receipt of a due diligence fee, and if a borrower client continued to be interested in obtaining a loan from Prime Capital, Prime Capital signed a line of credit ("LOC") agreement with the borrower client and obtained an upfront interest payment from or for the benefit of the borrower client while promising to start funding the borrower's loan within a specified timeframe, generally a few months.   This upfront interest payment was characterized by Prime Capital as the "Interest Credit Account Payment," or "ICA" payment for short.   Once the ICA payment was wired from the borrower client to Prime Capital, an account on the books and records of Prime Capital was supposed to be created to serve as the "Interest Credit Account." A credit equal to the ICA payment was supposed to be noted in the Interest Credit Account for purposes of satisfying interest payments on the loan.  Credits to each borrower's ICA payment were to be debited over time as a loan was funded and accrued interest.   Depending on the size of the loan that Prime Capital promised, an ICA payment could be in the millions of dollars; Prime Capital obtained ICA payments as large as $20 million.    The defendant and Roglieri promised that an ICA payment would be fully refundable within a specified timeframe if the contemplated loan

did not materialize. As the defendant stated in an email dated May 6, 2022, in response to a question about how Prime Capital would use the ICA funds: "[the ICA payment] is wired over to [Prime Capital] and credited to their own ICA account, to be used over the course of the term to cover interest only payments due. At the exit, the balance remaining goes back to the client." The defendant repeated this representation to many clients and prospective clients. For instance, in an email dated April 27, 2023, the defendant responded as follows to a prospective client's question about whether Prime Capital could transfer ICA funds without a client's permission:

> When we pull through the hf [hedge fund], it [the ICA payment] gets locked by RBC [Royal Bank of Canada], Goldman [Sachs] or Interactive [Brokers] themselves. And it doesn't get unlocked until the line is completely paid back. In other words, if the ICA is $10m and the facility is $50m- RBC locks the 10m at the time they make the 50m facility available. It doesn't leave the account but we can't do anything with if bc [because] they collateralized it. Once we pay the 50m back they unlock the 10m.

The defendant's statements in this email were false because (i) Prime Capital had no present ability to obtain loan funding from any of the financial institutions she mentioned, and funding based on third-party sources was uncertain, and (ii) Prime Capital, since it began receiving ICA payments in 2022, had been transferring and spending ICA payments.

e) The defendant knew that in June 2022, Prime Capital had accepted, from client Indigo Pharmaceuticals ("Indigo"), an ICA payment in the amount of $1 million, even though Prime Capital had no ability to fund the $20 million loan that Indigo was seeking. On July 8, 2022, the defendant sent an email to Roglieri titled "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." The defendant sent this email to Roglieri because she knew that at the time,

Prime Capital had no source of funding for a loan to Indigo. By reply email on July 8, Roglieri wrote to the defendant, "Get yourself under control. NOW." During that same period, Roglieri, on behalf of Prime Capital, signed contracts that obligated Prime Capital to provide a $20 million loan to Indigo.

f)  While researching possible third-party sources of funding, the defendant located a company ("Company-1") that represented itself to be a hedge fund.   As the defendant knew, on October 24, 2022, Roglieri sent $20 million in client ICA funds to a bank account controlled by Company-1.   The defendant and Roglieri expected that Company-1 would use the $20 million to generate additional funds that Prime Capital could then lend to its clients.   But Company-1 did not become a source of funds for Prime Capital and Prime Capital alleges that Company-1 fraudulently did not return the $20 million in ICA funds that Prime Capital sent to it.   Neither the defendant nor Roglieri disclosed to Prime Capital's clients or prospective clients that Company-1 had failed to return $20 million in client ICA funds.

g)  In late 2022 and continuing into 2023, and still without any source of loan funding, the defendant, Roglieri, and Snyder continued to falsely represent to clients that Prime Capital could fund commercial loans.   They continued to solicit and receive due diligence fees and ICA payments.   Roglieri was drawing on ICA payments to pay the defendant and Snyder.

h)  In January 2023, Roglieri used approximately $3.8 million in due diligence and ICA funds to buy a house in Virginia Beach for the defendant to use as a residence and office.

i)  The defendant also knew that Prime Capital used, and intended that Prime Capital use, due diligence fees and ICA payments paid by newer borrower clients to partially fund loans to,

or to refund due diligence fees and ICA payments to, older borrower clients, contrary to Prime Capital's representations that ICA payment credits would be used only for the benefit of the borrower that made the ICA payment.   For instance, on August 9, 2023, the defendant and Snyder exchanged the following text messages:

| Sender | Message |
|---|---|
| Defendant | Fuck |
| Defendant | 350 is not coming |
| Snyder | At all?? |
| Snyder | Shit |
| Snyder | Why? |
| Defendant | Bc [a borrower]'s investor wants to look over all docs |
| Defendant | And said it will take a couple of days |
| Defendant | We need it for [a different borrower] today |

In these messages, the defendant expressed alarm because a $350,000 ICA payment from a prospective borrower was delayed and Prime Capital needed that money to fund a loan to a different borrower.

j)   As another example, the defendant and Snyder exchanged the following text messages on September 19, 2023:

| Sender | Message |
|---|---|
| Defendant | If we don't get a closing in today |
| Defendant | It's over |
| Defendant | Nothing we can do anymore |
| Snyder | We gotta start selling some stuff off so we can pay our bills. I need cash. |
| Snyder | Is there any point in having the csll [call] w [a prospective borrower] today then? He won't be able to wire today |
| Defendant | Doubtful |
| Defendant | It killed us when no LOIs [letters of intent] or closings happened |
| Defendant | Everyone requested ICA and dds [due diligence fees] back |
| Defendant | And we can't come back from it |
| Defendant | There are [law]suits all over |
| Defendant | Kris threw in the towel |

In these messages, the defendant explained that Prime Capital could not meet its obligations to its existing borrower clients because it had no funds – either due diligence fees or ICA payments – coming in from new borrower clients.   The defendant acknowledged that Prime Capital "can't come back from it" and that Prime Capital was the defendant in "[law]suits all over."  Beginning in or around August 2023, as Prime Capital was sued and threatened with lawsuits, and with third-party loan funding still uncertain, the defendant realized that she was participating in a fraudulent scheme.

k) Yet the defendant continued to work with Roglieri and Snyder to find new borrower clients and to solicit due diligence fees and ICA payments from those borrowers based on false representations that Prime Capital could secure loans for them and false promises that a borrower's ICA funds would be used solely for that client's benefit and fully refundable within a specified timeframe if a loan did not materialize.

l) For instance, Roglieri, on behalf of Prime Capital, signed an LOC with borrower client 1322 Developments, LLC ("1322 Developments"), dated August 25, 2023, in which Prime Capital agreed to issue a loan of up to $46,350,000, to fund a real estate development project.    The LOC required 1322 Developments to provide, to Prime Capital, an ICA payment in the amount of $15 million.

m) In September 2023, pursuant to its LOC with 1322 Developments, Prime Capital received an ICA payment comprised of two checks totaling $14,249,832.   Roglieri deposited the checks into an account in Prime Capital's name at RBC Capital Markets.

n) On September 26, 2023, Roglieri initiated a wire transfer of $7 million of 1322 Developments' ICA payment from the RBC Capital Markets account to an account at Farmers State Bank (Illinois) in the name of Prime Capital.   The defendant and Roglieri

then initiated wire transfers of this money from the Farmers State Bank account to other bank accounts connected to other projects that Prime Capital had previously agreed to fund.

o) In December 2023, the defendant, Roglieri, and Snyder fraudulently sought and obtained a $5 million ICA payment from 1800 Park Avenue LLC ("1800 Park"), a company that sought Prime Capital's assistance in obtaining a loan to build an egg production facility. 1800 Park made this ICA payment based on the false contractual promise from Roglieri that the funds would be kept in a "separate and distinct account" and would be "refundable" if Prime Capital and 1800 Park did not enter into an agreement for an approximately $100 million LOC.   The defendant, Roglieri and Snyder sought 1800 Park's ICA payment even after learning, on December 19, 2023, that several of Prime Capital's creditors had started an involuntary bankruptcy proceeding against Prime Capital in the United States Bankruptcy Court for the Northern District of New York.

p) On December 22, 2023, after Roglieri and 1800 Park signed a contract prepared by Snyder, 1800 Park transferred the $5 million ICA payment to a Prime Capital account at KeyBank controlled by Roglieri.   Roglieri then transferred, stole, and fraudulently used the funds by initiating wire transfers over the Internet from his home in Warren County, New York, to KeyBank servers in Ohio.   These transfers included:

- On December 22, 2023, Roglieri transferred $950,000 to an existing Prime Capital client based in Saratoga County, New York, as partial loan funding for the client's real estate project.

- On December 22, 2023, Roglieri transferred $2 million to a credit union account held by a Virginia company owned by an associate of the defendant.   Her associate then used some of these funds to wire money to Snyder for the defendant's benefit, and to make at least $130,000 in payments to third parties for the defendant's benefit.

q) During the defendant's involvement in the conspiracy, more than a dozen victim borrowers paid Prime Capital and Prime Commercial due diligence fees and ICA payments exceeding

$50 million based on false representations about Prime Capital's ability to secure funding and false promises that ICA payments would be refundable within a specified timeframe. The defendant herself received at least $382,500 in fraud proceeds, not including the Virginia Beach house that Prime Capital purchased for her temporary residence, and $130,000 that the defendant's associate paid to third parties for the defendant's benefit.

**Count 2 (health care fraud)**

r)  At all times relevant to the information:

    (1) The defendant, a resident of Virginia Beach, was the owner of two licensed pharmacies – GenX Pharmacy ("GenX") and Sparrow Pharmacy, LLC ("Sparrow"), doing business as Cavalier Drug Pharmacy, both located in Chesapeake, Virginia.

    (2) Medicaid and TRICARE, operated by the Defense Health Agency, were health care benefit programs as defined in Title 18, United States Code, Section 24(b).

    (3) "Compounding," in the pharmaceutical field, meant the creation of a pharmaceutical preparation by a licensed pharmacist, in accordance with a licensed practitioner's prescription, to meet the unique needs of an individual patient when a commercially available drug did not meet those needs.  Common examples of compounding included customizing a medication's strength or dosage, changing a medication's flavor to make it more palatable to a patient, reformulating the medication to exclude an unwanted non-essential ingredient such as lactose, gluten, or other ingredients to which a patient might be allergic, or to the change the form of the medication for patients who have difficulty swallowing or experience stomach upset from oral medications.

s)  Beginning in 2018 and continuing through June 2019, the defendant devised and carried out a scheme to defraud health care benefit programs. The defendant routinely altered

doctors' prescriptions to fraudulently inflate her pharmacies' billings to various health care benefits programs, including Medicaid and TRICARE. The defendant caused the addition and deletion of ingredients from prescribed compounded drugs, the addition of drugs to prescriptions, and the substitution of different drugs from those listed on a prescription to maximize her pharmacies' health insurance billings. For instance, various doctors prescribed their patients compounded creams that contained active ingredients necessary for their patients' care and submitted them to the defendant's pharmacies for dispensing. To fraudulently inflate her pharmacies' billings to health care benefit programs, the defendant caused the de-compounding of these prescriptions without consulting the doctors who prescribed the medications, in order to bill the various health care benefit programs for each individual active ingredient contained in the compounded prescription. In this manner, the defendant was able to fraudulently increase the amount billed to health care benefits programs.

t)  The defendant also forged doctors' prescriptions to defraud various health care benefits programs. The defendant forged and then filled patients' prescriptions for a lidocaine spray known as KamDoy that contains 1% lidocaine. The doctors who purportedly issued these prescriptions for KamDoy had, in fact, never issued them. Various different lidocaine creams and sprays (e.g., Aspercreme), which contain up to 4% lidocaine, can be purchased over the counter at pharmacies for less than $10. By contrast, the defendant billed health care benefits programs approximately $1,200 for each KamDoy prescription.

u)  The defendant received a total of at least $486,194.68 as a result of her submission of fraudulent claims to health care benefit programs.

6)    **Sentencing Stipulations:**

a)    The parties agree that for Count 1, the base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).

b)    The parties agree that for Count 1, the offense involved a reasonably foreseeable loss of more than $25 million but less than $65 million, resulting in a 22-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

c)    The parties agree that for Count 1 the offense involved more than 10 victims, resulting in a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

d)    The parties agree that for Count 2, the base offense level is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).

e)    The parties agree that for Count 2, the offense involved a loss of more than $250,000 but less than $550,000, resulting in a 12-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

f)    The parties agree that for Count 2, the defendant abused a position of trust in a manner that significantly facilitated the commission of the offenses, resulting in a 2-level upward adjustment pursuant to U.S.S.G. § 3B1.3.

g)    The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

h) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. § 3E1.1(a).

7)     **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following:

a) The conviction resulting from the defendant's guilty plea;

b) Any term of imprisonment of 97 months or less;

c) Any sentence to a fine within the maximum permitted by statute;

d) Any sentence to a term of supervised release within the maximum permitted by statute;

e) Any condition of supervised release on any ground (including procedural or substantive unreasonableness) that the defendant did not raise in the District Court despite both (i) notice in the presentence investigation report that the Probation Office had recommended the condition and (ii) an opportunity to object in the District Court;

f) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement; and

g) Any special assessment permitted by statute.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case. The Government and the defendant agree that this waiver applies regardless of whether any term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. If the court imposes a term of imprisonment at or below the number of months specified above, the defendant's waiver of appeal and/or collateral attack includes any claim of procedural or substantive error in the determination or imposition of the term of imprisonment. If the court imposes a term of supervised release and/or a fine within the maximum permitted by statute, the defendant's waiver of appeal and/or collateral attack includes any claim of procedural or substantive error in the determination or imposition of the term of supervised release and/or fine. The defendant further waives the right to raise on appeal or on collateral review any claim that (a) the statutes to which the defendant is pleading guilty are unconstitutional and (b) the admitted conduct does not fall within the scope of the statutes. The defendant does not waive the right to raise a claim of ineffective assistance of counsel in an appeal or collateral attack on his conviction and sentence.

---

A. **Right to Counsel:** The defendant has the right to be represented by counsel—and if necessary have the court appoint counsel—at trial and at every other stage of the proceeding. Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

17

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the

defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

**E.  <u>Sentencing</u>:**

a.  **Maximum terms of imprisonment:**  The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement.  If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other.  Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively.  *See* 18 U.S.C. § 3584.

b.  **Sentencing guidelines:**

   i.  The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder.  While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

   ii.  Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court.  Until the Probation Office

has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

c. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

d. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the

Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

e. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

f. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the

Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

g. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

a. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b. A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

a. The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

b. The defendant consents to the entry of an order of forfeiture of the assets described above.

c. The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant

23

consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d.  Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e.  In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f.  The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g.  The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy

defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h.  The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

i.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property.  The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

**I. Determination of Financial Condition and Payment of Interest and Penalties:**

a.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

b.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

c.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

d.  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

**J.  <u>Remedies for Breach:</u>**

a.  Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part.  In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b.  If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

i.  To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement.  The defendant waives (gives up) any defense or objection to the

26

commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

ii.  In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

iii.  To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv.  To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v.  To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi.  To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K.  **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant.  References to "the government" in this agreement refer only to that Office.  This agreement does not bind any other federal, state, or local

prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

JOHN A. SARCONE III
United States Attorney

_____          6-10-25
Joshua R. Rosenthal                       Date
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140

28

_____

Kimberly Humphrey
Defendant

_____
Date

_____

Thomas A.  Capezza
Alexandra N.  Von Stackelberg
Attorneys for Defendant
Bar Roll Nos. 503159 & 705595

_____
Date